UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SANDRA HERAS,

                Plaintiff,

    -against-

METROPOLITAN LEARNING INSTITUTE, INC., and
BORIS DAVIDOFF,

                Defendants.
------------------------------------------------------------------X

**REPORT &
RECOMMENDATION**
19-CV-2694-DG-SJB

**BULSARA, United States Magistrate Judge:**

    Plaintiff Sandra Heras ("Heras") filed this action on behalf of herself and a putative Fair Labor Standards Act ("FLSA") collective against the Metropolitan Learning Institute, Inc. ("MLI") and Boris Davidoff ("Davidoff" and collectively, "Defendants"), alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219, and New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 160–199.[1]  Heras was employed by MLI to solicit and recruit prospective students to enroll in MLI's classes.[2]  Defendants now seek summary judgment, primarily on the grounds that Heras's role as a "school agent" rendered her an "outside salesperson" exempt from the protections provided under FLSA and NYLL.[3]  For the reasons described below, the Court respectfully recommends the motion be denied in its entirety.

---

[1] Compl. dated May 7, 2019 ("Compl."), Dkt. No. 1; Am. Compl. dated May 12, 2019 ("Am. Compl."), Dkt. No. 3; Second Am. Compl. dated Feb. 17, 2021 ("Second Am. Compl."), Dkt. No. 27.

[2] Second Am. Compl. ¶¶ 47–48.

[3] Mot. for Summ. J. dated Nov. 17, 2022 ("Defs. Mot."), Dkt. No. 123; Defs.' Am. Rule 56.1 Statement of Material Facts ("Defs. 56.1 Stmt."), attached as Ex. 2 to Defs. Mot.; Pl.'s Rule 56.1 Counterstatement of Material Facts ("Pl. 56.1 Stmt."), Dkt. No. 124-1.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion.

*See* Loc. Civ. R. 56.1(a)–(b).  In both instances, the party must support its position by citing to admissible evidence from the record.  *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims.  *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation).  In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole— weigh evidence or assess the credibility of witnesses.  *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).  Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded."  *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1.  The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)).  The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence.  *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to

defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence). The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The parties' Rule 56.1 statements are, quite frankly, a complete and total mess, and run afoul of the basic rules governing such submissions, namely: (1) the statements

are replete with legal conclusions and argument;[4] (2) many factual statements contain no citations to the underlying record;[5] and (3) when citations are provided, the purported evidence often bears no resemblance to the fact supposedly undisputed.[6] Most of these errors are contained in Defendants' statement, and make it almost impossible—even before legal argument is considered—for them to prevail on summary judgment.  The Court cannot, and does not, rely on the portions of Defendants' or Plaintiff's statements that run afoul of these basic Rule 56.1 requirements.  From the limited number of paragraphs without error, the Court finds the following facts—drawn

---

[4] *See, e.g.*, Defs. 56.1 Stmt. ¶ 24 ("Plaintiff testified that her 'sales' duties constituted approximately 80% of the day, while her administrative office duties constituted of 20% (Exhibit 17 - Heras depo. pp. 70; 1-10), which is notable because this percentage has historically been a bright-line test as pertaining to the FLSA outside sales exemption cases (as further delineated in Defendants' Memorandum of Law)."); *id.* ¶ 37 ("Plaintiff testified that recruiters were also instructed to also generate their own leads . . . which is another established indicator of sales activities.  See 261 F. Supp. 2d at 975 - as further described in Defendants' Memorandum of Law[.]"); *see also* Defs. 56.1 Stmt. ¶¶ 5, 23, 25, 34.

[5] *See, e.g.*, Defs. 56.1 Stmt. ¶ 8 ("Because Plaintiff's origin was from Ecuador, Plaintiff's native language was Spanish[.]" (no citation provided)); *id.* ¶ 33 ("The recruiter then forwards the documents to the bursar's office and liaises with the financial aid officer/bursar to finalize registration." (no citation provided)); *see also id.* ¶¶ 16, 23, 29–32, 48–49, 51, 56–57, 60, 62–64, 68–69).

[6] *Compare* Defs. 56.1 Stmt. ¶ 16 (contending Heras "was terminated on April 15, 2019 for reasons unrelated to her FLSA claim that are attributed to her general lack of performance over a prolonged period of time, as well as suspicion of impropriety of confidential information in regards to a direct competitor of MLI (Exhibit 8 – Heras depo. pp. 59;3-5)"), *with* Dep. Test. of Sandra Heras ("Heras Dep."), Ex. 8 to Defs. 56.1 Stmt., at 59:3–5 ("Q: Did you ever refer students, well, prospective students, from MLI to Ace Institute?"); *compare* Defs. 56.1 Stmt. ¶ 35 ("MLI carefully kept track of how many students each school agent recruited in order to distinguish the high-performing recruiters from the low-performing recruiters (Exhibit 25 - Heras depo. pp. 28;5-6)."), *with* Heras Dep., Ex. 12 to Defs. 56.1 Stmt., at 28:4–6 ("I drove with the flyers and business cards, talked with the people and explain about school."), *and* Dep. Test. of James Bruce ("Bruce Dep."), Ex. 25 to Defs. 56.1 Stmt., at 28:5–6 ("A: Yes, but, in general, raises were given on the basis of performance."); *see also* Defs. 56.1 Stmt. ¶¶ 7, 20, 30, 32.

from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted.[7]

MLI is a private, non-profit organization that provides post-secondary educational programs at campuses in Rego Park and Brooklyn, New York. (Second Am. Compl. ¶ 41; Defs. 56.1 Stmt. ¶ 9). Boris Davidoff is President and CEO of MLI. (Second Am. Compl. ¶ 43).

Heras completed high school in her native county, Ecuador; upon her arrival to the United States, she received a high school equivalency diploma. (Defs. 56.1 Stmt. ¶ 7; Pl. 56.1 Stmt. ¶ 7). She was employed by MLI from August 27, 2018 until April 15, 2019 as a "school agent" on its Rego Park campus. (Defs. 56.1 Stmt. ¶¶ 15, 18, 52; Pl. 56.1 Stmt. ¶¶ 15, 18, 52). James Bruce was the director of the Rego Park campus where Heras worked throughout the course of her employment. (Defs. 56.1 Stmt. ¶ 15; Pl. 56.1 Stmt. ¶ 15). Upon her hiring, Heras signed and dated MLI's "Agent Training & Supervision Manual." (Defs. 56.1 Stmt. ¶ 19; Pl. 56.1 Stmt. ¶ 19). She also underwent training, which included information about MLI's programs and courses and relevant state laws applicable to conduct by school agents. (Defs. 56.1 Stmt. ¶¶ 39–40; Pl. 56.1 Stmt. ¶¶ 39–40).

---

[7] On September 20, 2022, Heras submitted—in addition to a 56.1 counterstatement of material facts—her own 56.1 statement of material facts in opposition to summary judgment. (Pl.'s Statement of Material Facts in Opp'n to Summ. J., Dkt. No. 116). However, Heras is not moving for summary judgment and, not surprisingly, Defendants have not filed a response to her statement. Indeed, this separate statement was not included in the fully briefed bundled motion filed on January 11, 2023. As such, the Court does not consider Heras's 56.1 statement, or the exhibits attached thereto, and relies solely on Defendants' 56.1 statement and Heras's 56.1 counterstatement.

Heras testified she was required to hold a school recruiter's license under New York law—or a "private school agent's certificate"—which identified Heras as a "temporary certified sales agent." (Defs. 56.1 Stmt. ¶ 6; Pl. 56.1 Stmt. ¶ 6). Her LinkedIn profile stated her occupation was "sales agent." (Defs. 56.1 Stmt. ¶ 41; Pl. 56.1 Stmt. ¶ 41). While Defendants contend Heras is a "salesperson," Heras rejects that characterization because she was not selling items like clothes, bags, pants, or shoes but rather "recruiting students like a human." (Heras Dep., Ex. 22 to Defs. 56.1 Stmt., at 62:17–25).

Her duties included soliciting and recruiting prospective students at various places, including on public sidewalks and at malls, churches, elementary schools, and DMV locations. (Defs. Stmt. ¶¶ 37, 47; Pl. Stmt. ¶¶ 37, 47; Second Am. Compl. ¶ 48). Recruiters were trained by MLI on what to say to prospective students when approaching them. (Defs. 56.1 Stmt. ¶ 28; Pl. 56.1 Stmt. ¶ 28; Heras Dep., Ex. 20 to Defs. 56.1 Stmt., at 25:19–26:10). MLI provided its recruiters with business cards, flyers, tables, and a sign, to facilitate these direct face-to-face interactions. (Heras Dep., Exs. 9 & 21 to Defs. 56.1 Stmt., at 16:23–17:15, 28:4–6; Defs. 56.1 Stmt. ¶¶ 27, 30; Pl. 56.1 Stmt. ¶¶ 27, 30). Once an interested individual expressed a "commitment" to enroll, the applicant signed an enrollment agreement. (Defs. 56.1 Stmt. ¶¶ 32, 34; Pl. 56.1 Stmt. ¶¶ 32, 34).

In addition to these duties, Heras also gave prospective students tours of the campus and, if they enrolled, verified their documents, helped them complete paperwork in support of their application, and prepared them for the start of classes. (Heras Dep., Ex. 9 to Defs. 56.1 Stmt., at 16:10–13; Defs. 56.1 Stmt. ¶¶ 22, 34; Pl. 56.1 Stmt. ¶¶ 22, 34). She was required to attend and participate in daily morning meetings

at MLI's offices at which recruiters would plan and discuss the travel and set-up for the day. (Defs. 56.1 Stmt. ¶¶ 22, 43; Pl. 56.1 Stmt. ¶¶ 22, 43). At these meetings, Heras—along with other recruiters and the campus director—would decide on the solicitation location for that particular day. (Defs. 56.1 Stmt. ¶¶ 43–44; Pl. 56.1 Stmt. ¶¶ 43–44). At approximately 9:30 A.M., Heras would travel from MLI to that day's location, typically by train or by one of the recruiter's vehicles. (Defs. 56.1 Stmt. ¶ 45; Pl. 56.1 Stmt. ¶ 45). Recruiters would typically travel in groups of four, and were further broken up in sub-groups of two; Heras was paired with another Spanish-speaking recruiter, and was also under the supervision of a senior recruiter. (Defs. 56.1 Stmt. ¶ 46; Pl. 56.1 Stmt. ¶ 46).

Heras's "most important" duty was to "bring students." (Heras Dep., Ex. 18 to Defs. 56.1 Stmt., at 80:2–22; Defs. 56.1 Stmt. ¶ 26; Pl. 56.1 Stmt. ¶ 26). She testified that 80% of her work was performed "outside in the field"—that is, soliciting students in public locations—and the other 20% was spent performing tasks such as assisting students with the preparation of documents. (Heras Dep., Ex. 16 to Defs. 56.1 Stmt., at 69:22–70:10; Defs. 56.1 Stmt. ¶ 24; Pl. 56.1 Stmt. ¶ 24). As such, Heras spent the majority of her time away from MLI's offices "in the field." (Pl. 56.1 Stmt. ¶ 21; Defs. 56.1 Stmt. ¶ 21).[8]

---

[8] Defendants mischaracterize Heras's deposition testimony at various points. In their Rule 56.1 statement they contend that "Plaintiff testified that her 'sales' duties constituted approximately 80% of the day." (Defs. 56.1 Stmt. ¶ 24). But the cited portion of her deposition testimony, (Heras Dep., Ex. 17 to Defs. 56.1 Stmt., at 70:1–10), does not use the words "sales." The testimony in fact indicates that Heras spent 80 percent of her time attempting to solicit students. By adding a legal conclusion to the testimony and adding the pivotal word "sales" in quotes, Defendants both misuse the Rule 56.1 statement and exaggerate the record. That has the effect of rendering much of the statement nugatory and unreliable.

Heras's hourly wage was $15 per hour. (Defs. 56.1 Stmt. ¶ 50; Pl. 56.1 Stmt. ¶ 50). MLI school agents were sometimes eligible for raises, which were based on several factors, including seniority, the number of students successfully enrolled, and the level of effort in supervising or training other recruiters. (Defs. 56.1 Stmt. ¶ 36; Pl. 56.1 Stmt. ¶ 36; Bruce Dep., Ex. 25 to Defs. 56.1 Stmt., at 28:3–13).

According to MLI policy, recruiters were to work on Mondays through Fridays from 9:00 A.M. until 6:00 P.M., with a 1-hour lunch break, for a total of 40 hours per week. (Bruce Dep., Ex. 40 to Defs. 56.1 Stmt., at 120:17–23). MLI provided Heras with pay stubs—which included information such as hours worked and rates paid—for each pay period throughout the course of her employment. (Defs. 56.1 Stmt. ¶¶ 65–66; Pl. 56.1 Stmt. ¶¶ 65–66). A number of punch-in timecards indicated that Heras punched-in prior to 9:00 A.M., contrary to MLI policy. (Defs. 56.1 Stmt. ¶ 53; Pl. 56.1 Stmt. ¶ 53). Heras also testified she worked on some Saturdays and Sundays, for example while at church. (Defs. 56.1 Stmt. ¶ 37; Pl. 56.1 Stmt. ¶ 37; Heras Dep., Ex. 26 to Defs. 56.1 Stmt., at 27:4–19). And though James Bruce, director of MLI, testified it was the company's policy to provide a one-hour lunch break, (Defs. 56.1 Stmt. ¶ 55; Bruce Dep., Ex. 40 to Defs. 56.1 Stmt., at 120:17–23), Heras contends she only received 20 minutes. (Pl. 56.1 Stmt. ¶ 55; Heras Dep., Ex. 3 to Defs. 56.1 Stmt., at 76:2–10). She never spoke to any manager or supervisor about working extra hours. (Heras Dep., Ex. 3 to Defs. 56.1 Stmt., at 71:21–72:18).

School agents were expected to perform at a satisfactory level, and those who failed to enroll a certain number of students were warned, usually via a letter of reprimand, for poor performance. (Defs. 56.1 Stmt. ¶ 38; Pl. 56.1 Stmt. ¶ 38). Heras received such a letter. (Defs. 56.1 Stmt. ¶ 38; Pl. 56.1 Stmt. ¶ 38). Upon her termination

on April 15, 2019, Heras took with her files containing student information, including social security numbers.  (Defs. 56.1 Stmt. ¶ 54; Heras Dep., Ex. 39 to Defs. 56.1 Stmt., at 41:3–17).

Heras filed this action on May 7, 2019.  (Compl.).  Five days later, she filed an Amended Complaint.  (Am. Compl.).  Heras alleges five causes of action: (1) failure to pay overtime compensation under FLSA; (2) failure to pay overtime wages under NYLL; (3) failure to provide wage notices under NYLL § 195(1); (4) failure to provide wage statements under NYLL § 195(3); and (5) failure to pay spread of hours compensation under NYLL.  (Am. Compl. ¶¶ 53–77).

Defendants moved to dismiss the Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Mot. to Dismiss filed June 6, 2019, Dkt. No. 11).  The Honorable Dora L. Irizarry denied the motion in its entirety on January 7, 2021.  (Mem. & Order dated Jan. 7, 2021, Dkt. No. 22 at 13).  A Second Amended Complaint was filed on February 17, 2021.  (Second Am. Compl.).[9]  On September 28, 2021, the Honorable Roanne L. Mann granted in part Heras's motion to certify FLSA collective action, as to the MLI school recruiters employed at MLI's Rego Park campus on or after August 16, 2018.  (Mem. & Order dated Sept. 28, 2021, Dkt. No. 57 at 1–2).  The Court subsequently granted Defendants' uncontested motion for decertification, after the opt-in period elapsed and no employee sought to opt in.  (Sua Sponte R. & R. dated Jan. 11, 2022; Order dated Feb. 8, 2022).

Defendants sought a pre-motion conference in anticipation of a motion for summary judgment, (Mot. for Pre-Mot. Conference dated Jan. 10, 2022, Dkt. No. 90),

---

[9] The Second Amended Complaint contains the same five causes of action as the Amended Complaint.  (*See* Second Am. Compl. ¶¶ 72–96).

which the Court granted.  (Order dated June 1, 2022; Order dated June 13, 2022).  The fully briefed summary judgment motion was filed on January 11, 2023.  The Honorable Diane Gujarati referred the motion to the undersigned for a report and recommendation.  (Order Referring Mot. dated Jan. 13, 2023).

DISCUSSION

I.    <u>Outside Sales Exemption</u>

Defendants argue they are entitled to summary judgment on all claims because Heras was an exempt employee not entitled to the overtime protections under FLSA. FLSA exempts from its overtime provisions "any employee employed . . . in the capacity of outside salesman."  29 U.S.C. § 213(a)(1).  Congress "delegated authority to the [Department of Labor ("DOL")] to issue regulations from time to time to define and delimit" the term "outside salesman."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (quotations omitted); 29 U.S.C. § 213(a)(1) ("as such terms are defined . . . by regulations of the Secretary").  The current definition of the term is as follows:

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:
>> (1) Whose primary duty is:
>>> (i) making sales within the meaning of section 3(k) of the Act, or
>>> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>> (2) Who is customarily and regularly engaged away from the
> employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500.[10]  "Sale" is defined broadly and includes "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).

Courts "have no license to give the exemption anything but a fair reading."  *Vasto v. Credico (USA) LLC*, 767 F. App'x 54, 56 (2d Cir. 2019) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).  "The question of how an employee spends his or her time working is one of fact, while the question of whether those work activities exempt him or her from the FLSA is one of law."  *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018).  "Because inquiries into employees' FLSA-exempt status are fact-intensive, even where there has been full discovery, courts are often reluctant to grant summary judgment based on an FLSA exemption."  *Sexton v. Am. Golf Corp.*, No. 13-CV-873, 2015 WL 5884825, at *3 (E.D.N.Y. Oct. 8, 2015); *Indergit v. Rite Aid Corp.*, No. 08-CV-9361, 2010 WL 1327242, at *6 (S.D.N.Y. Mar. 31, 2010) ("Many courts have held that resolving this difficult and intensive factual inquiry is inappropriate at summary judgment.").

---

[10] The NYLL similarly exempts an "outside salesperson," defined as:

(5) Outside salesperson.  The term *outside salesperson* means an individual who is customarily and predominantly engaged away from the premises of the employer and not at any fixed site and location for the purpose of:
    (i) making sales;
    (ii) selling and delivering articles or goods; or
    (iii) obtaining orders or contracts for service or for the use of facilities.

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c); *see also id.* § 142-2.2 (stating that NYLL's overtime provision is subject to the exemptions set forth in FLSA, 29 U.S.C. § 213(a)(1)).

Defendants contend Heras's primary duty was to "make sales," and their briefing elides two questions.[11]  Whether an employee is "making sales" is a question "analytically distinct" from whether an employee's *primary duty* is "making sales." *Flood*, 904 F.3d at 233–34; *Vasto*, 767 F. App'x at 57.  That is, a court must first conclude an employee is "making sales" before it can proceed to evaluate whether that is her primary duty.

"It is the employer that bears the burden to establish the applicability of an exemption under the FLSA." *Flood*, 904 F.3d at 227; *see also Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 91 n.7 (2d Cir. 2013) ("A claim of exemption under the FLSA is an affirmative defense[.]").  Defendants bear the burden of proving Heras is an "outside salesman," and have failed to make that threshold showing as a matter of law.

The Second Circuit's decision in *Flood v. Just Energy Marketing Corp.* is instructive.  904 F.3d at 227–36.  Flood was employed by a group of affiliated energy supply companies—collectively named "Just Energy"—and was to conduct door-to-door solicitations to persuade prospective customers to buy their electricity and natural gas from them.  *Id.* at 223.  On a typical workday, Flood participated in a one-hour meeting at the company's regional offices.  *Id.* at 224.  Flood subsequently spent 75–80% of his time knocking on doors to solicit business; if his pitch was successful, the customer completed and signed a service agreement.  *Id.* at 224–25.  And at the end of the day, he returned to the regional office to submit copies of any customer agreements he secured. *Id.* at 225.  Flood was compensated on a 100% commission basis, in accordance with the

---

[11] Conceivably, Defendants could have also argued Heras was an "outside salesman" because her primary duty was "obtaining orders or contracts for service."  29 C.F.R. § 541.500(a)(1)(ii).  But they did not, and so the Court declines to consider whether that portion of the exemption is applicable here.

number of customers he convinced to purchase Just Energy's services—earning more than $70,000 in commissions per year—and also received incentive awards for travel. *Id.* at 225–26.

The Second Circuit held that Flood was "undoubtedly 'making sales'" because his job was not merely to promote or advertise products, but to approach customers face-to-face and persuade them "to sign up then-and-there for an energy plan." 904 F.3d at 229. Therefore, he obtained commitments to buy from customers, even though he lacked the authority, on his own, to fully consummate the sale (*i.e.*, close the deal) and bind the customer. *Id.* at 229–33. In reaching its conclusion, the Second Circuit applied a long-established test from the Department of Labor. Employees make sales "if they obtain a commitment to buy from the customer and are credited with the sale." Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122-01, 22162–63, 2004 WL 865626 (Apr. 23, 2004) (quotations omitted) (hereinafter "Defining and Delimiting"). This inquiry often turns on whether the person is engaged in activities directed toward the consummation of her *own* specific sales, rather than stimulating the sales of the company generally. *Id.* (citing Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, 83 (June 30, 1949)). Central to the court's holding that Flood was making sales was the fact that his compensation was derived 100% from commissions: "[That] Flood's entire compensation was from commissions he earned when he convinced customers to obtain" his companies' energy was a

14

"powerful indici[um] that Flood was indeed a salesman and . . . was . . . making sales." 904 F.3d at 234.[12]

Here, it is undisputed that Heras's duties included persuading prospective students to enroll at MLI, and obtaining a commitment in the form of a signed enrollment agreement. (Defs. 56.1 Stmt. ¶¶ 32, 34; Pl. 56.1 Stmt. ¶¶ 32, 34; Heras Dep., Ex. 23 to Defs. 56.1 Stmt., at 65:23–66:3). But Defendants then argue because her compensation was tied to enrollment of students, Heras was "making sales." (Defs.' Mem. of Law in Supp. of Defs. Mot. ("Defs. Mem."), attached as Ex. 1 to Defs. Mot., at 24; Defs.' Mem. of Law in Reply to Pl.'s Opp'n ("Defs. Reply"), Dkt. No. 125 at 7–8; Defs. 56.1 Stmt. ¶¶ 35–36). Defendants have failed to provide factual support to decide the issue in their favor as a matter of law. That is, there are insufficient facts in the record describing—outside of Heras's fixed hourly wage—the structure of any incentive or reward-based compensation, making it impossible to determine whether Heras was "credited" with "sales" of enrolled students. Defendants argue they provided employees "regular wage increases for above-average performance." (Defs. Reply at 7). But that conclusion is not supported by any admissible Rule 56.1 evidence. The only such fact presented is the conclusory assertion that employees were sometimes given "raises," based on seniority, the number of students successfully enrolled, and the level of effort in supervising or training other recruiters. (*See* Defs. 56.1 Stmt. ¶ 36; Pl. 56.1 Stmt. ¶ 36; Bruce Dep., Ex. 25 to Defs. 56.1 Stmt., at 28:3–13). That is it. There is no

---

[12] The district court similarly relied upon the fact of Flood's commission-based compensation in finding he was an outside salesman: "If [Flood] was not making the sale, who was? No one? This makes no sense. Indeed, he was paid *commissions* based directly on sales he had made. The proof is in the pudding, so to speak." *Flood v. Just Energy Mktg. Corp.*, No. 7:15-CV-2012, 2017 WL 280820, at *4 (S.D.N.Y. Jan. 20, 2017), *aff'd*, 904 F.3d at 238.

indication of how often such "raises" were given, how large they were, or when they were actually awarded.[13]  And while Defendants note that Heras was given pay stubs, (Defs. 56.1 Stmt. ¶ 65; Pay Stubs, attached as Ex. 44 to Defs. 56.1 Stmt.), they do not trace any pay increase or differential in pay, to any difference in the number of students she recruited in one period versus the next.[14]  Heras's own statements—which are almost the only witness testimony that Defendants cite to in their papers—do not suggest she received credit for her own, individual sales.  (Indeed, the sole information provided

---

[13] Defendants claim that recruiters like Heras were "credited with individual 'sales'" when a student is enrolled.  (Defs. 56.1 Stmt. ¶ 35).  But the deposition testimony cited to—from Heras—neither uses the word "sales" nor "credit."  (Heras Dep., Ex. 24 to Defs. 56.1 Stmt., at 80:1–24).  Besides continuing the pattern of exaggerating the record, *supra* n.8, Defendants also elide the difference between performance and salary "credit."  The former is relevant if it translates into increased compensation.  Defendants did not adduce any facts to show that whatever alleged credit Heras received in performance evaluations translated into a monetary reward.  Other than the general fact that the number of enrolled students is one component of "performance," there are also no details regarding what constitutes a "high performing" sales agent, or what sales goals an employee had to reach to receive a raise.

[14] Of course, it is possible that such facts are buried in the deposition testimony.  Or somehow contained in a document or piece of evidence alluded to in an otherwise improper paragraph in the Rule 56.1 statement.  But the whole purpose of 56.1 statements—and Local Rule 56.1 more generally—is to prevent courts from bearing the burden of digging through voluminous documents.  A court is not required to conduct an independent plenary review of the entire record in deciding summary judgment, and the Court declines to do so here.  *Charter Oak Fire Ins. Co. v. Tri-Cnty. Fire & Safety Equip. Co.*, 636 F. Supp. 2d 193, 197 (E.D.N.Y. 2009) ("[I]t is only those portions of the record submitted in connection with a motion to which the court's attention is specifically directed, that the court is obligated to consider in determining whether a material issue of fact exists."); *Holtz*, 258 F.3d at 73 ("[A] court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements[.]" (quotations omitted)); *e.g.*, *Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 17 (2d Cir. 2015) (affirming district court's denial of plaintiff's summary judgment motion based upon her filing a 56.1 statement that contained no record citations); *Emanuel v. Gap, Inc.*, No. 19-CV-3617, 2022 WL 3084317, at *3, *5 (S.D.N.Y. Aug. 3, 2022) (denying summary judgment motion for failure to provide a "usable" Rule 56.1 statement, including by failing to "lay out even the most basic, undisputed facts" and by citing to "nothing at all for . . . factual propositions").

about Heras's actual pay is that she was paid $15 an hour, and the conclusory statement that she was eligible for raises based on these criteria.  (Defs. 56.1 Stmt. ¶¶ 36, 50; Pl. 56.1 Stmt. ¶¶ 36, 50)).  Those facts suggest that she was a salaried employee, not one whose pay was commission based.  *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) ("The logic of the [outside salesman] exemption is that 'such a salesman, to a great extent, works individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.'  An outside salesman's extra compensation comes in the form of commissions, not overtime[.]" (quoting *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941))).

This is fatal to Defendants' summary judgment motion.[15]  Courts in this Circuit overwhelmingly agree that "[t]wo hallmarks of outside sales employees are generating new business and getting paid for that business on commission."  *See, e.g.*, *Rakeman*, 2020 WL 13566471, at *5; *Veracka v. MLD Mortg. Inc.*, No. 16-CV-7152, 2021 WL 2662007, at *4 (E.D.N.Y. Apr. 1, 2021) ("Employees who generate new business and who are paid on commission are more likely to be considered outside sales

---

[15] Defendants reference Heras's job title and license classification, (Defs. 56.1 Stmt. ¶¶ 6, 18), but the standards for outside salesman classification are designed to look beyond the formality of title.  "An employee's agreed-upon job title is not dispositive of his or her exempt status."  *Rakeman v. MLD Mortg. Inc.*, No. 16-CV-453, 2020 WL 13566471, at *5 (E.D.N.Y. Dec. 18, 2020) (citing 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee.")).  And as such, the fact that documents refer to Heras as a "sales agent" is insufficient to grant summary judgment, in light of the relevant criteria, like compensation, which suggest the exemption is inapplicable.  (Also, perhaps unknowingly, Defendants shift their description of Heras in their Rule 56.1 statement, repeatedly calling Heras a "recruiter," (*e.g.*, Defs. 56.1 Stmt. ¶¶ 30–33), suggesting the use of "sales agent" on a job application is not dispositive.)  Given the scant factual evidence that Defendants have proffered, the addition of her job title does not tip the decision of summary judgment in their favor.

employees."); *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507, 2021 WL 4177209, at *8 (S.D.N.Y. Sept. 14, 2021) ("Th[e] relatively consistent commission-oriented compensation structure suggests that Plaintiff was indeed 'making sales' for purposes of the outside sales exemption analysis and was compensated as a salesperson.").

Indeed, in those cases in this Circuit granting summary judgment on the basis of the "outside salesman" exemption, it was abundantly clear and indisputable that compensation was based—at least in part—on commissions, or other incentive-based payment "crediting" the employee with the sales he made. *See, e.g.*, *Mizrahi v. S.A.N.D. Auto. Warehouse, LLC*, No. 18-CV-3023, 2022 WL 4451061, at *4 (E.D.N.Y. Sept. 23, 2022) (granting summary judgment where plaintiff's pay was based exclusively on commissions, such that he was incentivized "to make as many sales as possible, as opposed to working as many hours as possible"); *Tortorici*, 2021 WL 4177209, at *8–*9 (finding, on summary judgment, that plaintiff was an outside salesman, where "a significant portion of [his] compensation was commission based," having earned commissions ranging from 3–5% of his sales) (adopting report and recommendation); *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 441–42 (S.D.N.Y. 2017) (holding, on summary judgment, that plaintiffs' primary duty was to "make sales," where plaintiffs were paid on a commission basis); *Vasto v. Credico (USA) LLC*, No. 15-CV-9298, 2017 WL 4877424, at *4, *20 (S.D.N.Y. Oct. 27, 2017) (granting summary judgment where "plaintiffs were paid on commission, receiving $10 per approved . . . application"), *aff'd*, 767 F. App'x at 57.

But here, the record is devoid of facts detailing any commissions, bonuses, incentives, or performance-based rewards Heras (or her colleagues) received. In other words, not only is the criteria by which Heras would have received raises missing, there

is also no actual evidence of the amounts of any such raise (or any other incentive-based compensation) that Heras actually received at any point.  Nor is there any evidence submitted of the number of students she enrolled at any one time.  Defendants, in other words, have offered insufficient evidence to conclude as a matter of law whether Heras engaged in "making sales."[16]

Defendants do not grapple with either the relevant in-circuit authorities or lacuna in the record, and only cite other cases disanalogous to the present facts.  Defendants rely on *Nielsen v. DeVry, Inc.*, a case in which the court held that the outside sales exemption applied to "field representatives" employed by DeVry, Inc., a "for-profit company that provides career-oriented, technology-based higher education at more than 25 campuses nationwide."  302 F. Supp. 2d 747, 750 (W.D. Mich. 2003).  The field representatives' job was "to identify potential students, persuade them to apply, and follow through with them to ensure they ultimately pay tuition and begin classes."  *Id.* In granting DeVry's summary judgment motion, the court relied on the fact that the

---

[16] As noted, *supra*, whether "making sales" is an employee's "primary duty" is a separate component of the outside salesman exemption.  *Flood*, 904 F.3d at 233–34. An employee's "primary duty" is defined as the "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Employees who spend "more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  *Id.* § 541.700(b).  The parties agree that Heras spent 80% of her time soliciting prospective students.  (Defs. 56.1 Stmt. ¶ 24; Pl. 56.1 Stmt. ¶ 24).  In addition, it is also required that the employee be "customarily and regularly engaged away from the employer's place or places of business" in performing her sales duties.  29 C.F.R. § 541.500(a)(2).  Here, Heras testified that she spent approximately 80% of her time "outside" in public locations—for example, at malls or on the sidewalks—soliciting students.  (Heras Dep., Ex. 16 to Defs. 56.1 Stmt., at 69:22–70:4). As such, the Court concludes—and indeed, Heras does not object on this point in her memorandum of law—that she "customarily and regularly" solicited students away from MLI's offices.  But having failed to establish that soliciting and signing up students constitutes "making sales," the fact that this was her primary duty does not entitle Defendants to summary judgment.

salary structure "provided an implicit commission-like feature," namely that the salaries were "periodic[ally]" adjusted upward or downward based on achievement of specific, identifiable performance objectives, such as number of high schools booked or lectured, number of interviews per week, and number of students who paid tuition and started classes. *Id.* at 757. In addition, 10–20% of the top performing employees were rewarded with an all-expense paid celebration at a resort hotel. *Id.* While *DeVry* provides an example where a salary structure based on student recruitment could result in employees being exempt, those facts are absent here. Proving facts—as opposed to merely identifying the relevant ones—is necessary to obtain summary judgment; while *DeVry* potentially identifies a discovery plan Defendants should have utilized in defending this case, they have not put in evidence those facts (either from their own records or depositions and certainly not from Plaintiff's deposition, which is the primary testimony they rely upon).[17]

Defendants also cite *Burke v. Alta Colleges, Inc.* for the proposition that "summary judgment motions have also been granted . . . in parallel cases wherein school recruiters were precluded to receive commissions based on state education law analogous[] to the case at bar." (Defs. Reply at 9). But the court in *Burke* denied summary judgment—after "carefully examining the parties' voluminous submissions" and hearing argument—holding there were genuine issues of material fact involving the plaintiffs' duties and, hence, whether the outside sales exemption was applicable. No.

---

[17] Defendants run into the same problem when they cite *Martinez v. Superior Health Plan, Inc.*, 371 F. Supp. 3d 370 (W.D. Tex. 2019). (Defs. Reply at 8–9). In *Martinez*, the plaintiffs were paid a base salary plus commissions, with additional bonus pay for exceeding sales goals. 371 F. Supp. 3d at 383–84. Defendants have not put forth sufficient evidence of the compensation structure here like that present in *Martinez*.

11-CV-2990, 2014 WL 2882807, at *3 (D. Colo. June 25, 2014).  The employer—Westwood College—characterized the primary job duty of Field Admissions Representatives as "sales" or "selling Westwood's educational programs and services to prospective students."  *Id.*  The plaintiffs, however, described themselves as "college recruiters."  *Id.*  The clash made summary judgment impossible.  And so, the *Burke* court's reluctance to determine the applicability of the exemption on summary judgment—after being presented with a far more developed factual record—counsels against doing so here, not the opposite.[18]

Defendants next argue that Heras "positively bears nearly 100% of the [external] indicia of outside sales elucidated" in the Supreme Court's decision in *Christopher*. (Defs. Mem. at 21–26).  These factors include: (1) whether the employee was hired for her prior sales experience; (2) whether she received any specialized sales training; (3) whether she worked away from the office; (4) the degree of supervision; and (5) whether the employee was rewarded for her efforts with incentive compensation.  *See Christopher*, 567 U.S. at 165–66.

The Second Circuit has cast doubt on whether these "external indicia" should carry any weight in the "outside salesman" analysis, observing that they are "unwritten"—that is, "no such listing of indicia appears in the relevant regulation defining what it means for an employee to be 'making sales.'"  *Flood*, 904 F.3d at 233–34.  Rather, the Second Circuit found that the passing reference to such indicia in

---

[18] After conducting a four-day bench trial, the district court concluded that the plaintiffs' work as school recruiters did, in fact, constitute "sales" such that they were outside salesmen exempt from FLSA's protections.  *See Burke v. Alta Colleges, Inc.*, No. 11-CV-2990, 2015 WL 1399675, at *40 (D. Colo. Mar. 23, 2015).  As such the exemption was determined after trial, not on summary judgment.

*Christopher*, the case from which they arise, was "arguably dicta." *Vasto*, 767 F. App'x

at 57. To that end, in *Christopher* the Supreme Court found that the "external criteria"

provided "further support" for a conclusion it had already reached, 567 U.S. at 165–66,

namely pharmaceutical representatives were salespersons even though they only

obtained nonbinding commitments to purchase. *Id.* at 165.

Nonetheless, analysis of these "external indicia" in this case does not lead to the

conclusion that Defendants are entitled to summary judgment. On the one hand, the

record suggests Heras received training upon her hiring at MLI, and she frequently

worked away from the office. That suggests she was making "sales." *E.g.*, *Flood*, 904

F.3d at 234 ("[That] Flood was extensively trained by Just Energy in selling

techniques . . . [is a] powerful [indicator] that Flood was indeed a salesman[.]"); *Martin*,

273 F. Supp. 3d at 442 (applying outside sales exemption, in part, because plaintiffs

spent a majority of their work hours performing their duties in the field, away from the

office). But on the other hand, there is no indication she had any prior sales experience,

or that she actually received any incentive compensation. That suggests she was not.

*E.g.*, *Hurt v. Com. Energy, Inc.*, 973 F.3d 509, 522 (6th Cir. 2020) (declining to find, as

a matter of law, employees were outside salesmen, in part because they were not hired

for their sales experience, their commission income was minimal, and they were not

rewarded with additional benefits). Further, there is evidence of substantial

supervision: she was required to work prescribed hours; participated in daily morning

meetings; was supervised at soliciting locations by a senior recruiter; and was instructed

on which locations to travel to and what information to relay to prospective students.

(Defs. 56.1 Stmt. ¶¶ 28, 43, 46, 53; Pl. 56.1 Stmt. ¶¶ 28, 43, 46, 53). And that more than

anything suggests she was not making sales. *Veracka*, 2021 WL 2662007, at *5 ("[T]he

higher the level of supervision, the less likely an employee is to be considered exempt as an outside salesperson[.]"); *Hurt*, 973 F.3d at 522 (holding employees did not bear external indicia of salesmen, in part because they were required to report to the office each day and were "closely supervised").  The totality of these factors, therefore, does not affirmatively point in one direction or the other, which counsels against a grant of summary judgment.

The Court makes two additional points.  *First*, the Second Circuit in *Flood* emphasized that Flood did "not point to any peculiarity of the utility or energy industry that should warrant a more restrictive application of the term 'making sales' for purposes of the outside salesman exemption."  *Flood*, 904 F.3d at 231.  But here—as Defendants acknowledge—New York law expressly prohibits school recruiters from receiving commissions per capita, with several exceptions.  (*See* Defs. 56.1 Stmt. ¶ 36 ("NYS law directly prohibits paying a commission per each student enrolled for a school agent at any state-accredited school[.]")); *see also* N.Y. Educ. Law § 5004(1)(c) ("No consideration or renumeration shall be paid in the form of a fee per student enrolled by a private school agent except pursuant to the following limitations[.]").  And even in the limited circumstances where such a commission is permissible, "the total amount . . . paid per student may not exceed one percent of the annual salary paid to the agent."  N.Y. Educ. Law § 5004(1)(c)(3).  Certainly, this is a "peculiarity" or distinctive feature of the school recruitment industry that may warrant different treatment—New York law effectively contemplates that school agents are to be paid primarily via a fixed

wage.[19]  Yet, despite the acknowledgment of the legal bar against such commission compensation, Defendants do not explain how their compensation model falls outside of these restrictions, a necessary prerequisite to summary judgment (since the Court presumably cannot exempt Defendants from FLSA (or NYLL) if the means for so doing was through a pay practice that itself was illegal).

*Second*, the Department of Labor has suggested that FLSA exemptions—such as the outside salesman exemption—are based "on the belief that such workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay." *Flood*, 904 F.3d at 227 (quoting Defining and Delimiting, *supra*, at 22123–24); *see also Christopher*, 567 U.S. at 166 ("Petitioners—each of whom earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory—are hardly the kind of employees that the FLSA was intended to protect.").  This work was considered "difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult." *Flood*, 904 F.3d at 227 (quotations omitted).  To that end, here Heras was required to punch in and out every

---

[19] The federal Higher Education Act ("HEA") also prohibits institutions from providing "any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments . . . to any person or entity who is engaged in any student recruitment or admission activity."  34 C.F.R. § 668.14(b)(22)(i).  The parties do not brief, however, whether MLI is subject to the restrictions imposed by the HEA.

day, and was expressly forbidden from receiving wages for work exceeding 40 hours. (Defs. 56.1 Stmt. ¶¶ 53, 67; Pl. 56.1 Stmt. ¶ 53, 67; Bruce Dep., Exs. 38 & 40 to Defs. 56.1 Stmt., at 120:10–23, 130:15–25).[20]  Because she never received any raise or bonus Heras was effectively capped at making $31,200 per year.  That places her in contrast to many of the cases where summary judgment has been granted on the basis of the exemption. *E.g.*, *Flood*, 904 F.3d at 226, 238 (affirming summary judgment where plaintiff earned more than $70,000 in commissions per year); *Christopher*, 567 U.S. at 151, 169 (concluding that employees whose annual gross pay ranged from $72,000 to $76,000 qualify as outside salesmen).  And that places this case more like those where summary judgment has been denied, in the face of a claim that the employee is exempt.  *E.g.*, *Burke*, 2014 WL 2882807, at *3 (denying summary judgment where college admissions representatives received annual salary of $50,000); *Hurt*, 973 F.3d at 523 (affirming denial of defendants' motion where evidence showed plaintiffs received no base pay and "made much less than minimum wage—a stark contrast to the lead plaintiff in *Flood*"); *Beauford v. ActionLink, LLC*, 781 F.3d 396, 400, 402–03 (8th Cir. 2015) (upholding denial of defendant's summary judgment motion on basis of outside sales exemption where employees were paid roughly $42,000 per year).

In sum, viewing the evidence in its totality, the Court concludes Defendants have not met their burden of establishing there is no genuine dispute of material fact regarding whether Heras was an outside sales employee under FLSA or NYLL. Accordingly, the Court recommends denying that part of Defendants' summary

---

[20] Defendants assert that Heras "never asked for a raise," (Defs. 56.1 Stmt. ¶ 7), a fact that suggests that her compensation was fixed, not variable, and to earn more, an increase in her minimum wage was required.

judgment motion seeking dismissal of Heras's first, second, third, fourth, and fifth causes of action based upon application of the federal outside salesman exemption or its New York equivalent.  *Burke*, 2014 WL 2882807, at \*1–\*3; *Veracka*, 2021 WL 2662007, at \*6.

II.   Wage Notice Claim

Count III of the Second Amended Complaint alleges a failure to provide wage notices under NYLL § 195(1).  (Second Am. Compl. ¶¶ 84–87).  New York's Wage Theft Prevention Act ("WTPA") requires employers to provide written wage notice "within 10 business days of his first day of employment."  *Hernandez v. JRPAC Inc.*, No. 14-CV-4176, 2016 WL 3248493, at \*29 (S.D.N.Y. June 9, 2016).

> [E]mployers [must] provide their employees a written notice with the following information: (1) the rate or rates of pay and basis thereof; (2) allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; (3) the regular pay day designated by the employer; (4) the employer's name; (5) any "doing business as" names used by the employer; (6) the physical address of the employer's main office or principal place of business, and a mailing address if different; (7) the employer's telephone number; and (8) such other information as the commissioner deems material and necessary.

*Id.* (quoting *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 474 (S.D.N.Y. 2015)) (citing NYLL § 195(1)(a)).  The written notice must be "in writing in English and in the language identified by each employee as the primary language of such employee."  NYLL § 195(1)(a).

Heras received a notice, which she acknowledges, but it was in English.  (Decl. of Sandra Heras dated June 19, 2019 ("Heras Decl."), Dkt. No. 18 ¶ 18; Notice and Acknowledgment of Pay Rate and Payday Under Section 195.1 of the NYLL, attached as Ex. A to Heras Decl.; Pl.'s Letter-Mem. of Law in Opp'n to Defs. Mot. ("Pl. Mem."), Dkt. No. 124 at 3).  Heras contends that nonetheless, Defendants are not entitled to summary

judgment because the § 195 notice was not also in her primary language, Spanish.  (Pl. Mem. at 3).  Defendants then contend that because Heras "did not need a Spanish translator for her deposition," she is precluded "from asserting that she did not receive them in Spanish, and thus did not sufficiently understand it."  (Defs. Mem. at 29).  To the extent that this is an attempt to demonstrate that there is no material fact dispute about Heras's primary language, such facts should have been included in the Rule 56.1 statements with citation to the record.  But they were not.  Lawyer argument is not admissible evidence.  *See supra* at 3–4.

In any event, the argument has no merit.  Whether she understood the English language at the time of her deposition has no bearing on whether she sufficiently understood the language at the time of her hiring—more than three years prior—or whether she identified Spanish as her primary language upon her hiring.  Moreover, it is clear from the Court's review of Heras's deposition that counsel's conclusions about Heras's English proficiency are baseless.  The deposition is riddled with inconsistencies and instances in which Heras evidently did not understand counsel's questions.  (*See, e.g.*, Heras Dep., Ex. 13 to Defs. 56.1 Stmt., at 19:16–17 ("A: I don't—I don't understand the question."); *id.*, Ex. 19 to Defs. 56.1 Stmt., at 25:12–14 ("Q: Okay.  Do you know what a script means?  A: No."); *id.*, Ex. 18 to Defs. 56.1 Stmt., at 78:16–21 ("Q: Okay.  And can you tell me the relative importance of the sales duties?  Do you know what relative importance means, the importance?  A: What?  The relatives?  Q: No, not relatives like cousins.")).  At one point during the questioning, a paralegal was asked to translate the word "commitment" in Spanish.  (*Id.*, Ex. 23 to Defs. 56.1 Stmt., at 65:11–23).  Given this record, summary judgment on this claim is inappropriate.  *See Mendez v. MCSS Rest. Corp.*, 564 F. Supp. 3d 195, 219 (E.D.N.Y. 2021) (finding summary judgment on

employee's NYLL wage notice claim inappropriate because of material dispute over whether employee's primary language was English or Spanish); *Choi v. Home & Home Corp.*, No. 17-CV-5400, 2019 WL 4193449, at *6 (E.D.N.Y. Sept. 3, 2019) (denying defendant summary judgment where plaintiff received and signed English language form without indicating his primary language, but where plaintiff contends his primary language is Korean, and his deposition was conducted with the aid of an interpreter); *Agudelo v. E & D LLC*, No. 12-CV-960, 2012 WL 6183677, at *6 (S.D.N.Y. Dec. 11, 2012) ("[I]f his primary language is Spanish, then § 195.1 entitles him to notice in Spanish."); NYLL § 195(1)(a) ("Every employer shall provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice[.]").

III.   Wage Statement Claim

Defendants also seek summary judgment on the claim that they failed to accurately disclose the number of hours Heras worked on her wage statements, as required by NYLL § 195(3).  (*See* Defs. Mem. at 29–30).

The WTPA requires that employers provide employees wage statements "with every payment of wages" that contain, among other things, the dates of work covered by the statement, the rate of pay, and gross and net wages paid.  NYLL § 195(3).  As evidence of their compliance with the WTPA, Defendants submitted the pay stubs that Heras received each pay day, from the start to the end of her employment.  (*See* Ex. 44 to Defs. 56.1 Stmt.).  Heras contends that she was not paid for all hours worked and, as such, was not provided with accurate wage statements.  (Pl. Mem. at 3; Pl. 56.1 Stmt. ¶ 50).  And "[c]ourts in this district have held that the New York Labor Law's legislative objective is the furnishing of *accurate* wage statements."  *Santiago v. Home Infusion*

*Grp., Inc.*, No. 20-CV-5455, 2022 WL 5175117, at *5 (E.D.N.Y. June 7, 2022) (collecting cases), *report and recommendation adopted*, 2022 WL 17798164, at *3 (Dec. 19, 2022). When there is a dispute about whether the pay stubs are accurate, because they fail to document the pay that an employee was entitled to, as opposed to merely documenting the illegal wage practices of an employer, summary judgment is inappropriate. *See, e.g.*, *Pierre v. Hajar, Inc.*, No. 15-CV-2772, 2018 WL 2393158, at *6 (E.D.N.Y. Mar. 28, 2018) (denying defendants' summary judgment motion because "whether the subject vouchers constitute compliant wage statements depends on the number of hours Pierre actually worked, which . . . is a genuine issue of material fact to be determined at trial").

If at trial Defendants do not establish their entitlement to the outside sales exemption, then under their own policy, they did not pay any employee, including Heras, for any work over 40 hours (and she has alleged she routinely worked such hours).  (Defs. 56.1 Stmt. ¶¶ 53, 67; Pl. 56.1 Stmt. ¶ 53, 67; Bruce Dep., Exs. 38 & 40 to Defs. 56.1 Stmt., at 120:10–23, 130:15–25).  That would make their wage statements all inaccurate, because they not only failed to document hours beyond 40 per week, but also only show non-overtime compensation.  *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 467–69 (E.D.N.Y. 2015) (holding that failure to list overtime hours plaintiff worked on wage statements violates § 195(3)); *see also Gonzalez v. Dom's Lawnmaker, Inc.*, No. 17-CV-3519, 2022 WL 17488524, at *8 (E.D.N.Y. Dec. 7, 2022) ("The Court agrees with Plaintiffs that a failure to include all hours worked on their wage statements would render those inaccurate and would, thus, violate NYLL § 195(3).").  Because Defendants are not entitled to summary judgment on the salesman exemption, it would be inappropriate to conclude that as a matter of law Defendants' wage statements were accurate and dismiss this claim.

IV.    <u>Spread of Hours Claim</u>

Heras has also alleged a violation of NYLL's spread of hours provision, which requires that an "employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage . . . for any day in which the spread of hours exceeds 10 hours."  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4(a); (*see* Second Am. Compl. ¶¶ 92–96).  The spread of hours is the "interval between the beginning and end of an employee's workday," including working time, plus time off for meals and time off duty.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.18.

Defendants argue that the spread of hours law "is only generally applicable to the 'hospitality industry'" and, as such, Heras is precluded from receiving spread of hours pay.  (Defs. Mem. at 31).  This argument is meritless.

As a threshold matter, Defendants are correct that the regulations regarding spread of hours pay are found in industry-specific wage orders promulgated by the Commissioner of Labor.  Specifically, the Commissioner has promulgated minimum wage orders unique to the building service industry, *see* N.Y. Comp. Codes R. & Regs. tit. 12, §§ 141-1.1–3.12, and hospitality industry, defined as "any restaurant or hotel."  *See id.* §§ 146-1.1–3.13.  But there is also a "Miscellaneous Industries and Occupations" minimum wage order which, by its terms, applies to "all employees" who are not covered by any other minimum wage order, such as Heras—a school recruiter.  *Id.* § 142-1.1.  And that wage order does, in fact, provide spread of hours protection.  *See id.* § 142-2.4(a); *Almonte v. 437 Morris Park, LLC*, No. 14-CV-5951, 2015 WL 7460019, at *3

(S.D.N.Y. Nov. 24, 2015).  The Court, therefore, recommends summary judgment on this claim be denied.[21]

CONCLUSION

For the reasons described above, the Court respectfully recommends Defendants' motion for summary judgment be denied in its entirety.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of service of this report.  Failure to file objections within the specified time may waive the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[ ] [judge's] report operates as a waiver of any further judicial review of the magistrate[ ] [judge's] decision." (quotations omitted)).

SO ORDERED.

/s/ *Sanket J. Bulsara*  August 18, 2023
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

---

[21] Defendants ask the Court to find in their favor on this claim because Heras failed to specifically oppose this argument in her memorandum of law.  (Defs. Reply at 12).  The Court declines to do so, because this argument—that spread of hours is limited to the hospitality industry—is not grounded in law.